**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

BISCEGLIE & ASSOCIATES, P.C.
1527 Franklin Avenue, Suite 301
Mineola, New York 11501
P: (516) 414-2900
F: (888) 688-4206
*Attorneys for Plaintiff Andrew Barcia*

| | |
|---|---|
| ANDREW BARCIA,<br><br>   Plaintiff,<br><br> vs.<br><br>HOUSING AUTHORITY OF THE CITY OF PASSAIC, VICTOR CIRILO, PAMELA MITCHELL, individually and in their respective capacities as the Executive Directors of the Housing Authority of the City of Passaic,<br><br>   Defendants. | Civil Action No.:<br><br><br>**COMPLAINT and<br>JURY DEMAND** |

## COMPLAINT AND JURY DEMAND

   Plaintiff, Andrew Barcia, by and through his attorneys, Bisceglie & Associates, P.C., files the following Complaint and Jury Demand ("Complaint") against the Defendants Housing Authority of the City of Passaic ("PHA"), Victor Cirilo, and Pamela Mitchell individually and in their respective capacities as Executive Directors ("Directors") of the Housing Authority of the City of Passaic (collectively "Defendants"), states as follows:

## NATURE OF ACTION

1. This is a civil action seeking equitable relief and money damages against Defendants for committing numerous acts of retaliation against Plaintiff as a result, *inter alia*, for Plaintiff

blowing the whistle on the unlawful and/or unethical actions by the PHA and its respective Directors. These retaliatory acts deprived Plaintiff of rights secured under the First and Fourteenth Amendments of the United States Constitution and laws of the United States and the State of New Jersey.  Plaintiff also maintains a claim for violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), a claim under New Jersey Law Against Discrimination ("LAD"), breach of employment contract, and negligent and intentional infliction of emotional distress.

## JURISDICTIONAL STATEMENT

2.  This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331 and 1391.3.  The Court also has jurisdiction as Plaintiff's damages exceed $75,000.00.  The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.  This Court has supplemental jurisdiction over any New Jersey state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

3.  This action properly lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(c) and 29 U.S.C. 1132(e), because the Plaintiff and Defendants are citizens and residents of New Jersey and the Defendants conduct business, have significant contacts in New Jersey and are subject to personal jurisdiction in New Jersey.

## PARTIES

4. Plaintiff Andrew Barcia ("Plaintiff" or "Barcia") is an individual residing within the State of New Jersey, County of Bergen.

5. Defendant Housing Authority of the City of Passaic ("PHA") is a municipal office organized pursuant to the laws of the County of Passaic, the City of Passaic and the State of New Jersey.

6. Defendant Victor Cirilo ("Cirilo") is an individual residing within the State of New Jersey and is being sued in his individual and official capacity as former PHA Executive Director. At all relevant times hereto, defendant Cirilo had been the PHA's Executive Director.

7. Defendant Pamela Mitchell ("Mitchell") is an individual residing within the State of New Jersey and is being sued in her individual and official capacity as the PHA Executive Director.

8. Collectively, the PHA, Cirilo and Mitchell are referred to herein as the "Defendants."

## FACTS

9. Plaintiff was hired by the PHA in or about 1979 on a part time basis through the "CETA" program.

10. On or about January 1, 1981, Plaintiff became a fulltime employee of the PHA in the position of building maintenance worker.

11. In or about the early 1990's Plaintiff applied for and received a promotion to the position of maintenance repairer.

12. Ultimately, in or about 2009 after years of Plaintiff's dedicated service he was appointed the PHA's Director of Maintenance.

13. As Director of Maintenance Plaintiff was responsible for the oversight of maintenance for each of the PHA's residential buildings and was the direct supervisor for the maintenance department workers.

**Plaintiff's Whistleblowing Activity**

14. In or about August 2009, based on information obtained from a co-worker, Plaintiff [along with his wife Linda Colon, not a party to this action] informed Defendant Cirilo (while he was serving in his previous position as Assistant Director) and PHA's former Interim Director William Snyder ("Snyder") that a manager by the name of Pamela Mitchell ("Mitchell") was knowingly falsifying her work order reports and submitting them to the department of Housing and Urban Development ("HUD"). More precisely, Michell was submitting work order reports which falsely reflected work that had allegedly been done on tenants' behalf when in fact no such work had been completed.

15. Plaintiff recognized the falsification of HUD work orders by Mitchell as a serious violation of the law.

16. Plaintiff provided the above information to Messrs. Cirilo and Snyder in confidence and in hopes of the PHA taking corrective steps relative to the false reports filed by Mitchell with HUD.

17. As a result of Plaintiff's information, disciplinary action was taken against Mitchell, who was suspended for twenty (20) days.

18. After Plaintiff blew the whistle on Mitchell, he immediately noticed a drastic negative change in Cirilo's attitude towards him and thus started the commencement of retaliatory acts by Cirilo.

19. On or about March 2013 Plaintiff called to the attention of Cirilo that an employee by the name of Roosevelt Johnson was leaving work early without first seeking permission from the Plaintiff as his supervisor.

20. Simply put, Johnson was illegally being paid for work not performed.

21. A grievance hearing was held shortly thereafter, wherein Union Representative Michael Tkatch, in front of Cirilo, became very agitated at the Plaintiff, and physically threatened him and cursed Plaintiff.

22. Instead of supporting the Plaintiff during the grievance hearing, Cirilo sided with the grievant.  At the time of the incident, Roosevelt Johnson's daughter Beatrice Johnson was a PHA Commissioner.  Cirilo defended the actions of Roosevelt Johnson and his union representative and by implication belittled Plaintiff as a result of his whistle blower efforts.

23. During the meeting, Plaintiff pointed out that according to HUD Form 53012A, the employment of Johnson (the father of PHA's Commissioner) was a blatant violation of §19 (the "Conflict of Interest" provision, which disallows a member of the governing body from having a family member employed).

24. Shortly after the meeting, Roosevelt Johnson threatened to go to the Board in an attempt to have the Plaintiff fired.  Johnson's words were: "He's going to be out of here now." Cirilo allowed Roosevelt to threaten Plaintiff and took no steps to either discipline and/or direct him to cease and desist from the threats towards Plaintiff with the Board.

25. Following this second whistle blower event, Plaintiff was subjected to further retaliation by Cirilo.  [See Paragraph 42 for specifics on retaliation against Plaintiff].

26. In or about 2013 the PHA invited competitive bidding for work including capital improvements and general repairs at the PHA's residential buildings.

27. Both the proposed contract with respect to capital improvements and the proposed contract with respect to general repairs were let out to bid.

28. One of the companies which bid the general repairs was Saar Construction Inc. ("Saar"), which had previously performed work for the PHA.

29. Although Saar was the second lowest bidder, because the lowest bid did not comply with the bid requirements, Cirilo decided to award the repair contract to Saar.

30. Plaintiff strongly advised against awarding the contract to that Saar, since in his opinion their previous work was unsafe, shoddy, hazardous and did not meet PHA standards.

31. Therefore, Plaintiff recommended to Cirilo that Saar not be awarded the contract for repair work and the work should be re-bid

32. Cirilo ignored Plaintiff's recommendation and awarded Saar the contract.

33. One of the justifications used by Cirilo was that Saar was politically connected and its owner [Wayne Aliston] was a personal friend of PHA Chairman Darien Allen and City Council President Gary Schaer.

34. Moreover, despite Plaintiff's recommendation that the repair contract not be awarded to Saar, Cirilo took it upon himself to recommend Saar's for another one (1) year contract from June 2014 to June 2015. (This had never been done before by any Supervisor or Executive Director).

35. Plaintiff knew that by using Saar to perform repairs and capital improvements, tenants of the PHA public housing units would be subject to unsafe, substandard and hazardous living conditions.

36. After Saar was awarded the contracts for general repairs and capital improvements, Plaintiff brought to the attention of Cirilo the fact that Saar was leaving work unfinished,

unsafe and failing to clean up after themselves which not only violated their contract but was a theft of public funds because PHA employees were used to finish Saar's work and clean up after them.  Saar was never back charged for the work performed by the PHA employees.  Plaintiff brought this to the attention to Cirilo and recommended that Saar be terminated but Cirilo ignored his recommendation.

37. After blowing the whistle on Saar, Plaintiff noticed that Defendant Cirilo's agitation towards him continued and intensified.  [See Paragraph 42 for specifics on retaliation against Plaintiff].

38. On or about December 2014, Plaintiff reported to Cirilo that Hector Lora (the brother of Passaic County Freeholder Alex Lora), who was assigned to boiler coverage was fraudulently recording his time while failing to provide the services he was hired to provide to the PHA.

39. In particular, Lora was coming to work early and signing the boiler routine logbooks for the entire shift even though he was only on the PHA premises for approximately two (2) hours.  More precisely, Lora failed to punch out after his shift.  Plaintiff with the assistance of security confirmed that Lora was falsely inputting his time, thereby receiving pay for work not preformed.

40. Cirilo took no action to dock Lora for stolen time.  Cirilo blocked Plaintiff from receiving copies of the recordings, and upon information and belief, at Cirilo's direction such recordings no longer exist.  Instead, Cirilo heightened the harassment of Plaintiff.

**Retaliatory Acts**

41. After Plaintiff's initial whistle blowing activity regarding Mitchell, Plaintiff noticed an immediate downturn in Defendant Cirilo's attitude towards him and commencement of a series of retaliatory acts.

42. For example, Defendant Cirilo retaliated against Plaintiff by: (1) scolding him in public, verbally abusing him and permitting others to verbally abuse Plaintiff; (2) by not permitting him to attend regularly scheduled manager meetings; (3) by refusing to grant Plaintiff any salary increases for over seven (7) years, despite his excellent work as Director of Maintenance; (4) by refusing to approve performance bonuses for Plaintiff despite his outstanding work for the PHA, and even though such bonuses were customarily given to most other employees; (5) placing him on administrative leave for two (2) years while providing him with no justifiable reason for doing so; (6) taking away his position as Director of Maintenance; (7) reducing his salary while other minority PHA employees' salaries which were similarly situated were not reduced; and, (8) retaliating against his wife, Linda Colon a long standing PHA employee.  Upon information and belief, Cirilo retaliated against Colon to muzzle Barcia's complaints against Saar.

43. In another display of Cirilo's displeasure of Plaintiff's whistle blowing activities, on or about February 8, 2013, Plaintiff was confronted with a major snowstorm.  Part of his duties as Director of Maintenance is to clear the snow.  Cirilo called Plaintiff approximately 10:41 p.m.  Because Plaintiff was driving a snowplow, he could not answer the call but returned the call at 10:46 p.m.; and, Cirilo did pick up.  When Cirilo picked up the phone, Cirilo started yelling and cursing at the Plaintiff; despite the fact that Plaintiff was driving a snowplow for approximately seventeen (17) continuous hours.  Plaintiff completed his

snow removal efforts at 2:23 a.m.  Despite Plaintiff doing an outstanding job, Cirilo threatened to remove Plaintiff from his position as Director of Maintenance.  Cirilo's threats were made because Barcia did not pick up Cirilo's 10:41 a.m. call.  This is just another example of Cirilo's retaliation against the Plaintiff.

44. On or about March 2015, employee Roosevelt Johnson called his daughter Commissioner Beatrice Johnson to complain that he had tried to contact Plaintiff by phone but could not reach him after making only one call.  Johnson complained directly to the Commissioner. To perpetuate further harassment of Barcia, Cirilo did nothing to stop Johnson from directly contacting a Board Member.  Further, Johnson was never disciplined.  Cirilo turned a blind eye to Johnson's continued to violation of HUD's conflict of interest regulations.

45. On or about October 2016, Defendant Cirilo placed the Plaintiff on administrative leave.

46. Despite Plaintiff's numerous requests for a reason why he was placed on administrative leave for two (2) years (with pay), Defendants never provided one to him.

47. On or about October 2018, after Defendant Cirilo left his position as the Executive Director of the PHA, Plaintiff was notified in writing that he was expected to return to work.

48. However, Plaintiff was stripped of his position as Director of Maintenance.

49. Further, Plaintiff salary was reduced by approximately twenty thousand ($20,000.00) dollar/year, while similarly situated minority employees' salaries were not reduced.

50. Other PHA employees who were in supervisory positions but were later demoted, did not receive a salary reduction as Plaintiff did.

51. Defendant's harassment of, and hostile actions directed toward Plaintiff continue unabated to date:  Despite Plaintiff's numerous verbal and written requests over a seven (7) year period for a salary review, none were granted.  Plaintiff has not received a salary increase

even though all PHA personnel (the majority of which are Hispanic), except for Plaintiff and possibly one other employee (who have been litigants against Cirilo and PHA), have received annual increases. Plaintiff has been and continues to be deprived of the usual and customary annual salary review notwithstanding his excellent work performance; and while other PHA employees received annual increases and bonuses. Plaintiff's pension contributions have been severely impacted as a result of the PHA's conduct.

## COUNT I

### SECTION 1983 - FIRST AMENDMENT

52. Plaintiff hereby incorporates by reference paragraphs 1 through 51 of this Complaint as though same were fully set forth at length herein.

53. At all times relevant, Defendants retaliated against Plaintiff for exercising his First Amendment rights to freedom of speech with regard to issues that concern the public, including issues regarding unlawful practices, policies and customs of the Defendants.

54. As a direct and proximate result of the acts and omissions of Defendants herein described, Plaintiff has suffered loss of promotion, economic harm, other money damages, was caused mental emotional pain, anguish and suffering, and had been chilled in his exercise of his rights to freedom of speech and to petition for the redress of grievances under the First and Fourteenth Amendments to the United States Constitution, and, in addition, has suffered the loss of all the Constitutional rights described herein. In the manner described herein, Defendants acted with reckless disregard of Plaintiff's Constitutional rights.

55. Defendants knew or should have known that their actions would or probably would inflict great economic distress and pain and suffering upon Plaintiff.

56. At all times relevant, Defendant, PHA, has failed to train, discipline and/or supervise the actions of Defendant Cirilo acting under color of law.

57. Defendant PHA with oversight knew that Defendant Cirilo had previously committed similar Constitutional violations against others and Plaintiff but failed to discipline Cirilo and failed to take any measures to prevent Cirilo from violating Plaintiff's Constitutional rights and from committing similar Constitutional violations in the future.

58. In the manner described herein, Defendants have deprived Plaintiff of his rights to freedom of speech and due process of the law. All of these rights are secured to Plaintiff by provisions of the First, and Fourteenth Amendments to the United States Constitution and by 42 U.S.C. § 1983 and 1988. 176. In the manner described herein, Defendants' acts are a pattern and practice to deprive Plaintiff of his U.S. Constitutional rights.

## COUNT II

### Conscientious Employee Protection Act N.J.S.A. 39:19-1 *et seq.*

59. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 to 58 of the Complaint as if set forth at length herein.

60. Plaintiff's complaints to Cirilo about Saar's defective and shoddy work, and his recommendation to Cirilo that the repair contract should not be awarded to Saar, but should be rebid, were activities protected under the New Jersey Conscientious Employee Protection Act, N.J.S.A. § 39:19-3.

61. After Plaintiff complained about Saar's defective and shoddy work and recommended that the repair contract should not be awarded to Saar, but should be rebid, defendant Cirilo undertook a series of adverse employment actions against Plaintiff.

62. Plaintiff's complaint about Mitchell's falsification of work orders was an activity protected under N.J.S.A. § 39:19-3.

63. After Plaintiff complained about Mitchell's falsification of work orders, Defendants undertook a serious of adverse employment actions against Plaintiff.

64. Plaintiff's complaints made to Cirilo about Lora's theft of time were activities protected under N.J.S.A. 39:19-3.

65. After Plaintiff complained about Lora's theft of time, Cirilo undertook a series of adverse employment actions against Plaintiff.

66. Plaintiff's complaint about Johnson's unauthorized absence from the workplace without authorization were activities protected under N.J.S.A. 39:19-3.

67. After Plaintiff complained about Johnson's unauthorized leave, Cirilo undertook a series of adverse employment actions against Plaintiff.

68. As a direct and proximate cause of Defendants' unlawful employment practices, Plaintiff has sustained, and will continue to sustain, loss of earnings, loss of pension contributions, and other financial damages and has suffered, and continues to suffer, mental anguish.

<u>COUNT III</u>

<u>The New Jersey Law Against Discrimination N.J.S.A. 10:5-12 et seq.</u>

69. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 68 of the complaint as is set forth at length herein.

70. Plaintiff is a member of several protected classes under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") based upon her race, disabilities, and religious faith and upbringing.

71. Defendant PHA is an "employer" as defined under the LAD.

72. The defendant unlawfully discriminated against, harassed, and abused Plaintiff as a result of his protected status and/or perceived protected status.

73. Barcia, who is Caucasian, has been treated differently than other minority employees of the PHA.

74. More precisely, minority employees receive annual salary increase, receive overtime, partake in weekly manager meetings, and receive bonuses, while Barcia does not receive the same enumerated benefits.  Specifically, Barcia is subject to disparate treatment, has not received annual salary increases, reduction in salary while minority employees salaries were not reduced, is denied any overtime hours, and has been and continues to be treated totally different than the minority employees.

75. Because of Plaintiff's race, Defendants created and nurtured a hostile environment vis-à-vis Plaintiff thereby violating Plaintiff's rights under N.J.S.A. 10:5-12.

76. The foregoing facts and circumstances demonstrate that the defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff.

77. As a direct and proximate cause of Defendants' unlawful employment practices, Plaintiff has sustained, and will continue to sustain, loss of earnings, loss of pension contributions, and other financial damages and has suffered, and continues to suffer, mental anguish.

## COUNT IV

### Breach of Employment Contract

78. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 to 77 as if set forth at length herein.

79. Plaintiff and Defendants were parties to an implied employment contract and protections provided for conscientious employees who file whistleblower complaints, consistent with the PHA Handbook.

80. The Contract included an obligation that Defendant render its contractual performance in good faith, and in a manner that would neither interfere, hamper, nor deny Plaintiff the performances he bargained to receive.

81. Plaintiff rendered material performance of any and all obligations he had under the Contract and had discharged or otherwise satisfied any and all conditions precedent to his entitlement to Defendants' full and complete, good faith performances under the Contract.

82. Defendants' materially breached the Contract by and through its acts and omissions, including but not limited to the following: (a) Defendants putting Plaintiff on administrative leave while providing him with no reason for doing so; (b) Defendants unlawfully harassed, retaliated against, and discriminated against Plaintiff due to his whistleblowing activities by reducing his salary, denying him overtime, placing him on administrative leave with no explanation or reason given, taking away his position as "Director of Maintenance" while other similarly situated minority employees were not demoted.

83. The PHA has a Personnel Policy/Employee Handbook, which it provides to all employees.

84. Plaintiff received a copy of the Personnel Policy/Employee Handbook.

85. Plaintiff reasonably relied upon and expected to be bound by the terms and conditions of the PHA Handbook, since other employees with significant infractions of the Handbook received the benefit of the Handbook's protection.

86. The Personnel Policy/Employee Handbook served as the employment contract between the Plaintiff and the PHA.

87. According to the Handbook, PHA employees "have the right under the 'Conscientious Employee Protection Act (CEPA) to complain about any activity, policy or practice that the employees reasonably believe is in violation of a law, rule, or regulation promulgated pursuant to law without fear of retaliation or reprisal."

88. By Defendants conduct toward Plaintiff, they totally obliterated his rights under the Employee Handbook.

89. By Defendants' above-described actions, Defendants have breached the terms and conditions of the employment contract.

90. Plaintiff has been harmed, and will continue to be harmed, by virtue of Defendants' breach.

91. As a direct and proximate cause of Defendants' unlawful employment practices, Plaintiff has sustained, and will continue to sustain, loss of earnings, loss of pension contributions, and other financial damages and has suffered, and continues to suffer, mental anguish.

## COUNT V

### Intentional Infliction of Emotional Distress

92. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 to 91 as if set forth at length herein.

93. The actions of Defendant Cirilo toward the Plaintiff as recited above were extreme and outrageous and purposely done to inflict severe emotional distress upon Plaintiff.

94. No reasonable person in the Plaintiff's position would be able to endure this reprehensible, inexcusable and unacceptable conduct by Cirilo, who, inter alia, took steps to embarrass Plaintiff in front of his peers, treated him disparately for all PHA employees to see, and

acted with specific purpose to cause extreme and outrageous emotional distress upon the Plaintiff.

95. PHA did nothing at any time to curb the opprobrious conduct of Cirilo towards the Plaintiff.

96. As a direct and proximate cause Cirilo's actions have had a deleterious effect on Plaintiff's emotional health and marriage, causing him to suffer from mental anguish and distress.

## COUNT VI

### Negligent Infliction of Emotional Distress

97. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 to 96 as if set forth at length herein.

98. Defendant PHA knew or should have known of the above recited extreme and outrageous actions taken against Plaintiff by Cirilo.

99. Defendant PHA knew or should have known that Cirilo's actions were purposely done to inflict severe emotional distress upon Plaintiff.

100.     Defendant PHA failed to protect Plaintiff from the infliction of severe emotional distress by Cirilo.

101.     Defendant PHA failure to protect Plaintiff from the infliction of emotional distress has further caused Plaintiff to endure severe emotional distress.

102.     As a direct and proximate cause of Defendants negligence, Plaintiff has, and continues to suffer, mental anguish.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in her favor, and against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

a.  Accept jurisdiction over this matter;

b.  Impanel a jury to hear and decide this matter;

c.  Compensatory damages;

d.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

e.  Damages for humiliation, mental and emotional distress;

f.  Statutory damages;

g.  Punitive damages and liquidated damages;

h.  Attorneys' fees and costs of suit;

i.  Lawful interest – including pre-judgment interest on lost wages and pension contributions;

j.  Lawful interest – including pre-judgment interest on any wages and pension contributions not paid in a timely manner; and

k.  Such other, further and different relief as the Court deems fitting, just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury as to all issues so triable.

**BISCEGLIE & ASSOCIATES, P.C.**
*Attorneys for Plaintiff Andrew Barcia*

By: _____
                Angelo R. Bisceglie, Jr.

Dated: November 1, 2021